**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

**MARC MAGHSOUDI ENTERPRISES, INC.,**
**d/b/a GALLERIE ONE DISTINCTIVE**
**RUGS,**                                                          **Case Number 08 C 441**

**Plaintiff**                                                       **Judge Gottschall**
                                                                   **Magistrate Judge Cox**

**v.**

**TUFENKIAN IMPORT/EXPORT VENTURES, INC.**

**Defendant**

**PLAINTIFF'S RESPONSE IN OPPOSITION TO**
**DEFENDANT'S MOTION TO DISMISS**

NOW COMES MARC MAGHSOUDI ENTERPRISES, INC. d/b/a GALLERIE ONE

DISTINCTIVE RUGS ("GALLERIE ONE") by and through its attorneys, Gold & Coulson, a

partnership of professional and limited liability corporations, and responding to Defendant's

motion to dismiss, states as follows:

**Factual background as alleged in the Complaint.**

The relationship between GALLERIE ONE and TUFENKIAN began in October 2005

when TUFENKIAN became desirous of utilizing GALLERIE ONE as a dealer for its line of fine

carpets.  At that time, in return for agreeing to have GALLERIE ONE be its distributor to

interior designers, TUFENKIAN required GALLERIE ONE to purchase $75,000 worth of

sample carpets.  This $75,000 of samples was to be utilized on an ongoing basis by GALLERIE

ONE for display to its customers (interior designers) so that these interior designers would place

orders through GALLERIE ONE.  GALLERIE ONE would then purchase the ordered

TUFENKIAN carpets from Defendant referencing these samples.  To induce GALLERIE ONE

to participate in this agreement and invest $75,000, TUFENKIAN represented to GALLERIE

ONE that it would fill all orders to GALLERIE ONE for TUFENKIAN carpets.  At no time did

TUFENKIAN inform GALLERIE ONE that it would compete with GALLERIE ONE or

interfere with GALLERIE ONE's customers or employees.  In December of 2005, after paying

for the aforesaid samples, GALLERIE ONE began its promotion and sales for TUFENKIAN.

Between December of 2005 and early March of 2007, GALLERIE ONE purchased from

TUFENKIAN, based upon the aforesaid samples, an additional approximately $164,000 worth

of carpets which GALLERIE ONE sold to its customers for approximately $330,000 or a profit

of approximately $164,000 over a 14 month period.

TUFENKIAN also required GALLERIE ONE to expend an additional $15,000 during

this time to promote the TUFENKIAN brand in anticipation of future sales and profits from the

sale of the TUFENKIAN brand.  That $15,000 covered advertising for a period of time *after*

TUFENKIAN unilaterally decided to stop filling GALLERIE ONE's orders.  GALLERIE ONE

estimated profits in the years following March 2007 would increase substantially.

To further increase its profitability and promotion of TUFENKIAN's merchandise,

GALLERIE ONE hired BERNARD DRZAGA ("DRZAGA"), former marquis salesman of the

well known Pedian Company d/b/a CRI, the previous dealer for TUFENKIAN in the

Merchandise Mart.  GALLERIE ONE hired DRZAGA at a guarantee of $70,000 per year.

At some time in early March of 2006, DRZAGA informed GALLERIE ONE that he was

taking employment with TUFENKIAN after TUFENKIAN made him an offer.  As a result,

GALLERIE ONE found it necessary to almost double DRZAGA's guarantee to $120,000.

On March 12, 2007, only 14 months after Plaintiff began selling Defendant's carpets,

TUFENKIAN wrote GALLERIE ONE that it would no longer fill its orders for carpets.

Shortly thereafter, TUFENKIAN opened a showroom in the Merchandise Mart on a different floor from GALLERIE ONE to sell its carpets directly to GALLERIE ONE's clients.

**Federal Pleading Standards**

Two recent Supreme Court cases slightly altered the nature of federal pleading standards, but leave in place the general notice pleading requirement. *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) and *Erickson v. Pardus*, 127 S. Ct. 2197 (2007) tell us that more than "labels and conclusions" must be stated in a complaint yet the complaint need do no more than "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atlantic*, 127 S. Ct. at 1964-65.

**The Complaint clearly sets forth viable causes of action.**

The complaint's five causes of action clearly demonstrate a "scheme" by which Defendant misrepresented its intentions to Plaintiff in an effort to induce Plaintiff to sell Defendant's high-end carpets. After enticing Plaintiff to agree to sell its carpets, the true purpose of Defendant's actions became apparent. Defendant knew Plaintiff would increase Defendant's business and reputation in the local market through Plaintiff's efforts. Defendant would then dump Plaintiff and step in for itself. The scheme: "pump and dump".

**COUNT I: FRAUD**

In Illinois, "fraud is a conscious, calculated course of behavior designed to induce the victim's reliance." *Hollymatic Corp. v. Holly Systems, inc.*, 620 F. Supp. 1366, 1369 (N.D. Ill 1985). This district court in *Hollymatic* succinctly states the Plaintiff's burden. "[I]n order to

survive the pleading stage, a claimant must be able to point to specific, objective manifestations

of fraudulent intent- a scheme or device." *Id.* The plaintiff in *Hollymatic* failed to overcome this

burden. There the plaintiff alleged fraud based *solely* on an implied misrepresentation. Laid

bare, the plaintiff's claim in *Hollymatic* was simply that the defendants made certain promises

and failed to perform. This was not enough to carry the day and the court dismissed the action.

Unlike the plaintiff in *Hollymatic*, GALLERIE ONE alleges significant specific facts:

more than just a bare implied misrepresentation. Plaintiff has alleged TUFENKIAN stated it

would fill all orders placed by Plaintiff[1] but then concealed that it planned only to fill orders for a

short time before opening its own showroom in *the same exact place* where Plaintiff was selling

Defendant's products. (Compl. ¶s 19, 20, 14) Plaintiff has alleged that Defendant did not intend

to continue its relationship with Plaintiff, and in fact terminated that relationship. (Compl. ¶ 14)

Plaintiff has alleged that shortly after Defendant unilaterally stopped filling Plaintiff's orders,

Defendant opened its own showroom in the Merchandise Mart to syphon off Plaintiff's

customers established by Plaintiff's reputation during its many years in the Mart. (Compl. ¶ 15)

Defendant set the trap, Plaintiff bit, and the fraudulent scheme was accomplished.

This Court recognizes a claim arising from a scheme to defraud. (*Old Republic Insurance

Co. v. Ness, Motley, Loadholt, Richardson, and Poole*, 2005 WL 991909 (N.D. Ill. 2005)). In

*Old Republic*, Ness Motley counterclaimed against Old Republic for fraud. Motley claimed Old

Republic promised to insure against punitive damages claims, knowing that it could void any

such coverage by arguing that punitive damage insurance was disfavored in Illinois as against

---

[1] The law implies a "reasonable" time in an agreement if an agreement is silent. "Reasonable" is a question of fact. (See pp. 9-10, *infra*) "Reasonable" here is certainly more than 14 months!

public policy.  The court upheld Motley's fraud claim as substantively sufficient (while

dismissing the claim, with leave to amend, for lack of specificity in conformance with Fed R.

Civ. P. 9(b)).

Like Motley, Plaintiff here was victimized by an undisclosed scheme of Defendant.  In

*Old Republic*, the scheme was to promise coverage while planning at all times to deny it later.

Here, the scheme: promise a cooperative business arrangement, while planning at all times go it

alone after Plaintiff's groundwork and steal Plaintiff's customers. *Old Republic* applies.

**Detrimental reliance is obvious on the face of the complaint.**

In its motion, Defendant argues Plaintiff's claim for fraud is insufficient because it fails

to plead that Plaintiff "would have done something differently if the plaintiff had known the

truth."  Defendant is wrong.  "[I]f it is possible to hypothesize a set of facts, consistent with the

complaint, that would entitle the plaintiff to relief, dismissal under Rule 12(b)(6) is

inappropriate." *Veazy v. Communications & Cable of Chicago, inc.*, 194 F.3d 850, 854 (7th Cir.

1999).  Does it take a rocket scientist to conclude what GALLERIE ONE would have done if it

were honestly informed by TUFENKIAN to go ahead and "Invest $75,000 in promotional

materials, plus an additional $15,000 in advertising and sell your customers our products in the

Merchandise Mart for 14 months after which we will stop filling your orders to set up shop

ourselves"?  We think not. We wouldn't be here if TUFENKIAN were honest with Plaintiff.

Lastly, Defendant's argument on page 13 of its Motion that Plaintiff was not damaged

because it is willing to return $27,000 of samples it purchased from Defendant as credit is

disingenuous.  Plaintiff purchased $75,000 of samples and, indeed, still possesses approximately

$50,000 of samples which it can't unload. (Compl. ¶ 8)

## COUNT II: TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

To state a claim for tortious interference with prospective economic advantage in Illinois, a plaintiff must plead four elements.  The plaintiff must allege; 1) he had a reasonable expectation of entering into a valid business relationship; 2) defendant had knowledge of that expectation; 3) intentional and unjustified interference by the defendant that caused a breach in that expectation; and 4) damage to plaintiff resulting from defendant's interference.  *Fellhauer v. City of Geneva*, 142 Ill.2d 495, 511 (1991).

As to elements "1" and "2", Plaintiff's expectation was that its existing relationship with its interior designers would continue as to their purchase of TUFENKIAN fine carpets if Plaintiff could have provided Defendant's product.  Defendant certainly knew Plaintiff was deriving profits from the sale of TUFENKIAN carpets.  Plaintiff's expectation was entirely reasonable and obviously known to Defendant.  As to the third element, the unilateral termination by Defendant of carpet supply and the subsequent direct competition by Defendant was not an accident and obviously breached Plaintiff's expectations to derive profits from the sale of Defendant's material.

Finally, as to the fourth element, Plaintiff's damages are obvious.  TUFENKIAN is now hustling Plaintiff's clients in the same building.  Add to this conduct of Defendant, Plaintiff's investment (Compl. ¶ 15) and its prospect for future profits (Compl. ¶s 28-30) and the fourth element of the tort is satisfied.

Defendant also argues that Plaintiff's pleading does not reference specific third parties interfered with by Defendant.  Wrong again.  As stated, paragraph 15 of the Complaint alleges

that Defendant became Plaintiff's competitor at the Merchandise Mart and purposefully

interfered with Plaintiff's client base. *Rossi Distributors, inc. v. Lavazza Premium Coffees*

*Corp.*, 2002 WL 31207324 (N.D. Ill. 2002) is a case remarkably similar to the case before this

Court. It is also cited by Defendant to support its position as to Plaintiff's Count V. (See p. 10,

*infra*) In *Rossi*, the plaintiff was a retailer of coffee for defendant's products until the defendant

decided to unilaterally terminate the relationship and enter the retail sector itself. That plaintiff's

count on tortious interference with economic opportunity was upheld by Judge Kocoras over

defendant's 12(b)(6) motion to dismiss which also claimed the plaintiff did not identify third

parties that were interfered with:

> "Lavazza argues that Rossi has failed to identify which third parties were allegedly
> interfered with and that the general assertion that Lavazza 'interfered' with Rossi's client
> base is insufficient. It is true that Rossi fails to identify any specific instances when it
> lost a client and had a reasonable expectation of obtaining that client. However, Rossi
> states in its complaint that Lavazza became its competitor in the Chicago area and that
> Lavazza purposefully interfered with Rossi's client base. We think that provides
> Lavazza with a sufficient basis for the claim under Rule 12(b)(6). Under the liberal
> standard of Rule 12(b)(6) Rossi is not required to plead the names of all potential clients
> lost."

### COUNT III and IV: TORTIOUS INTERFERENCE WITH CONTRACTUAL AND BUSINESS RELATIONS

Plaintiff hired DRZAGA, a salesman knowledgeable as to Defendant's product line.

Defendant knew this: (Compl. ¶s 11, 33). So what does Defendant then do, knowing its going to

open in the Merchandise Mart, it steps in and tries to snatch DRZAGA away from Plaintiff's

employ: not only a malicious move, but yet another example of Defendant's "scheme" to

squeeze Plaintiff's every effort to its own benefit. (Compl. ¶ 13)

The elements of a prime facie case for tortious interference with contractual relations are

1) the existence of a valid and enforceable contract between the plaintiff and another, 2) the

defendant's awareness of said contract, 3) defendant's intentional and unjustified inducement of a breach of the contract, 4) the subsequent breach by the other, caused by the defendant's wrongful conduct, and 5) damages.  *Lusher v. Becker Bros. Inc.,* 155 Ill.App.3d 866, 868

Defendant argues Plaintiff's complaint is deficient because it fails to allege either an employment contract with DRZAGA or maliciousness on the part of Defendant.  Wrong. Plaintiff pleads both.  Paragraphs 11 and 12 allege that Plaintiff employed DRZAGA at a base of $70,000 per year.  Paragraph 13 states that Defendant tried to hire DRZAGA away causing Plaintiff to increase DRZAGA's base to $120,000.

As stated, Defendant's efforts to lure DRZAGA was simply one more step in its continuing scheme to undermine Plaintiff and steal away its customers: maliciousness. Defendant's conduct resulted in a breach of the initial employment agreement between DRZAGA and Plaintiff.  Plaintiff was forced to enter into a new contract with DRZAGA.  A hefty $50,000 increase.  Moreover,

> "The malicious inducement of an employee to terminate his existing employment and enter the employ of another gives rise to a cause of action, and the fact that the contract of employment is terminable at will does not bar recovery."  *Hi-Tek Consulting Services, Inc. v. Bar-Nahum*, 218 Ill.App.3d 836, 841 (1st Dist. 1991)

Defendant's argument that Plaintiff's Complaint is deficient because DRZAGA is an at-will employee fails.

## COUNT V: BREACH OF CONTRACT

Defendant's unilateral decision to discontinue filling customer orders for Plaintiff breached the contract between the parties.  Defendant argues that there was no explicit duration in the contract.  Doesn't matter. Whether or not a contract with no fixed duration is terminable at will depends upon the circumstances of the agreement. In a line of credit case where a bank did

not specifically state the duration of the line, the Illinois Appellate Court held:

> "When the continuation of a contract is without definite duration, the law will imply a
> reasonable time... Whether three months and twelve days was a reasonable time for
> duration of the line-of-credit agreement under the circumstances of this case is a question
> for the trier of fact... Every contract implies good faith and fair dealing between the
> parties... Good faith between contracting parties requires the party vested with
> contractual discretion to exercise it reasonably, and he may not do so arbitrarily,
> capriciously, or in a manner inconsistent with the reasonable expectation of the parties...
> We conclude the agreement gave the bank reasonable, not absolute, discretion."

(*See Carrico v. Delp*, 141 Ill. App. 3d 684, 689 (4th Dist. 1986)).  *First Commodity Traders, inc.*

*v. Heinold Commodities, inc.*, 766 F.2d 1007, 1012 (7th Cir. 1985);

In another similar line of credit case, *First National Bank of Cicero v. Sylvester*, 196 Ill.

App. 3d 902, 910 (1st Dist. 1990) the Illinois Appellate Court ruled:

> "*...the question of the agreement's duration should have been left for the jury*.
> Ordinarily, where no definite time is fixed during which an executory contract shall
> continue in force, it is terminable at the will of either party...this rule does not apply
> where the contract is not fully executory...Rather, when consideration for a promise
> requiring continuing performance has been partly executed, a court will be reluctant to
> hold that the promise is determinable at the promisor's pleasure...In such cases, the
> duration of the agreement is determined by the agreement as a whole, based on what is
> reasonable, and is a *question for the trier of fact*." (Emphasis added)

Plaintiff here provided ongoing promotional support and payment for Defendant's brand.

Throughout the first year of the agreement between the parties, Plaintiff paid $15,000 for

national brand promotion (Compl. ¶ 10) and purchased more inventory from Defendant to fill

Plaintiff's orders.  To allow Defendant to terminate the contract after just 16 months means

Plaintiff obtained no benefit from the additional promotion and advertising it did for Defendant.

As to Defendant's executory contract argument, it is "axiomatic" to use Defendant's

terminology that a contract is not fully, but partially executory, when consideration for a promise

requires continuous performance.  In such a case, a court will be reluctant to hold that promise is

terminable "at the promisor's pleasure." *Carrico, supra* at 689.  The contract between

GALLERIE ONE and TUFENKIAN is not fully executory.  Plaintiff performed on its promise

to promote Defendant's brand until Defendant's breach, and even thereafter, although it still has

been unable to sell $50,000 of Defendant's samples it purchased.  Plaintiff paid for advertising

before Defendant's breach.  The advertising continued to run after Defendant's breach. Under

the circumstances, the contract at issue was not terminable at Defendant's pleasure, but was

rather subject to a reasonable duration.  That duration is a question for a jury.

As mentioned at page 7, *supra*, Defendant cites *Rossi Distributors, inc. v. Lavazza*

*Premium Coffees Corp.*, 2002 WL 31207324 (N.D. Ill. Oct. 2, 2002) to support its motion with

respect to Count V.  *Rossi* is distinguishable as to Count V.  In *Rossi*, the court dismissed the

plaintiff's complaint because the plaintiff failed to allege *any* circumstances that would indicate

an implied duration.  Here, Plaintiff alleged both the initial $75,000 investment in sample

materials combined with ongoing investments in advertising for Defendant.  These facts give rise

to an implied duration which, as previously demonstrated is a question of fact to the jury.

### Conclusion

WHEREFORE, Plaintiff asks that Defendant's motion to dismiss should be denied.

Respectfully submitted,


By:     s/Arthur S. Gold
        One of their counsel

GOLD & COULSON
A Partnership of Professional
and Limited Liability Corporations
 and ROBERT J. KELTER
11 S. LaSalle Street
Suite 2402
Chicago, Illinois 60603
(312) 372-0777
(312) 372-0778 Facsimile


C:\wp51\asg\MAGHSOUDI Response to MTD.wpd




**STATE OF ILLINOIS**        )
                             )        **SS:**                                **#5231**
**COUNTY OF COOK**           )


                          **VERIFICATION**


        Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil
Procedure of the State of Illinois, the undersigned certifies that counsel of record were served
PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS by
electronic delivery on March 13, 2008.




                                        s/Arthur S. Gold